## Richmond

JOHN MIDDLETON FREEMAN

v.

COMMONWEALTH OF VIRGINIA

March 12, 1982.

Record No. 810480.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

*Fred G. Wood, Jr.; R. Lecky Stone, Jr. (Fred G. Wood, Jr. & Associates,* on brief), for appellant.

*Robert H. Anderson, III, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

A jury convicted John Middleton Freeman of the charge that he "did . . . feloniously produce or make sexually explicit visual material which has as a subject a person less than eighteen years of age," Code § 18.2-374.1(B)(2), and fixed his punishment at two years in the penitentiary. Appealing from an order entered January 12, 1981, confirming the verdict, Freeman contends that the statute, read as a whole, is unconstitutionally overbroad and vague.

In the spring and summer of 1979, Freeman, an unmarried 61-year-old free-lance artist, befriended J.M., an attractive five-year-old girl who played in the neighborhood where Freeman lived with his mother. On at least two occasions, he took snapshots of J.M., some in black and white and some in color. In some, J.M. was

shown partially or wholly nude with her genitals exposed in part or in full. Four of the five introduced in evidence depict her posing in erotic postures on Freeman's bed.

In September, Freeman approached J.M.'s mother and showed her the pictures. Mrs. M. testified that Freeman told her "that he had already shown them to a man in New York, a publisher, and that he was going to trade him rights to publish his book for the pictures. He wanted my approval". Mrs. M. did not approve and demanded the pictures. Freeman refused to give them to her but said he would sell them to her.

Testifying in his own defense, Freeman characterized J.M. as a precocious child with an active sexual curiosity. He said that she made sexual advances to him and asked him to photograph her in nude "Playboy" poses. He agreed, but only to make a record of her conduct in order to prove to her mother how "promiscuous" she was. He denied that he had shown the pictures to anyone other than Mrs. M., and he explained that all he asked as the price of the snapshots was the cost he incurred in making them. He acknowledged, however, that he had written a book of "fantasies" entitled "Irish Tales for Adult Children" which had been "accepted by publishers in New York." Freeman had "dedicated" the book to J.M. The publisher told him that "we will publish it for free but you will get royalties once it gets out."

The legislative goal of the statute Freeman attacks is basic to our constitutional analysis, and we examine the circumstances leading to its enactment. The evil the statute was designed to control is vividly described in published reports of private and governmental bodies which have been collected in numerous scholarly essays.[1] Drawing upon such works, we learn that so-called "sexploitation" of children grew to epidemic proportions in the decade of the 1970's. The American conscience was shocked by public media accounts of sexual exploitation of children by adults. What came to be known as "kiddie porn" in the underground obscenity market began to appear openly on bookstore shelves. Magazines displayed pictures of children engaged in activities ranging from lewd poses to intercourse, fellatio, cunnilingus, masturbation,

---

[1] *See, e.g.,* Comment, *Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation,* 12 U. Mich. J. L. Ref. 295 (1979); Comment, *Preying on Playgrounds: The Sexploitation of Children in Pornography and Prostitution,* 5 Pepperdine L. Rev. 809 (1978); Note, *Child Pornography: A New Rule for the Obscenity Doctrine,* 1978 U. Ill. L. F. 711.

rape, incest, and sado-masochism. According to one official estimate, child pornography has become the merchandise of a commercial enterprise grossing more than half a billion dollars a year.

Producers, publishers, and other merchandisers are not the only profiteers. Parents in necessitous circumstances often "rent" their children as models for photographers. And profit is not the only motive. Pedophiles, adults who have a sexual preference for children, derive an aberrant gratification from inducing children to perform sexual acts before a camera and looking at the pictures.

Whatever the photographers' motivations, and however great the illicit profit involved, society's chief concern is the injury inflicted upon its children in the process of production and sale. Typically, the photographer's model is the most vulnerable member of the juvenile population — the very young and trusting, the abandoned child, the product of a broken home, the unemployed runaway, the teenager with a drug addiction to support.

The harm the child suffers takes many forms. In the course of inducing the child to pose, the photographer may engage his model in a variety of sexual acts, with or without the child's consent. Even if the child is not sexually abused physically, the experience it undergoes may leave lasting psychological scars. Once the photograph is developed, the photographer may use it to persuade other children that the conduct it depicts is a social norm. Thus, he may induce others to become models, and if he is a child molester, he may use the picture to arouse the sexual instincts of his victim. Finally, there is growing evidence of a reciprocal cause-and-effect relationship between child pornography and child prostitution, male and female, heterosexual and homosexual.

Responding to parental alarms and public outrage, lawmakers began searching for new ways of dealing with a new threat to children. Old laws were unequal to the challenge. Statutes criminalizing rape, sodomy, incest, and other forms of child abuse did not treat with the harm resulting from the production of child pornography. A producer of child pornography could be convicted of contributing to the delinquency of a minor, but conviction carried only a misdemeanor penalty. Congressional measures criminalized the distribution but not the production of obscenity within the federal domain.

■ In the enactment of new laws, many states adopted the federal pattern. In Virginia, the General Assembly attacked the problem at its roots and in all its branches. Code § 18.2-374.1,[2] enacted near the end of the decade, focuses upon child pornography. It relates only to "sexually explicit visual material" which "utilizes or has as a subject a person less than eighteen years of age" and which is "obscene for children". The Virginia statute criminalizes the distribution of such material as well as its produc-

---

[2] § 18.2-374.1. **Production, publication, sale, possession, etc., of obscene items involving children.**—A. For the purposes of this article and article 4 (§ 18.2-362 et seq.) of this chapter, the term "sexually explicit visual material" means a picture, photograph, drawing, sculpture, motion picture film or similar visual representation which is obscene for children and which depicts nudity, sexual excitement, sexual conduct, sexual intercourse or sado-masochistic abuse, as defined in § 18.2-390, or a book, magazine or pamphlet which contains such a visual representation. An undeveloped photograph or similar visual material may be sexually explicit material notwithstanding that processing or other acts may be required to make its sexually explicit content apparent.

Sexually explicit visual material is "obscene for children" when the material meets all of the following criteria:

1. Considered as a whole, it appeals to the prurient interest of children as determined by the experience of children in the contemporary community.

2. It affronts contemporary standards of adults as to what is suitable matter for children.

3. Considered as a whole, it lacks serious literary, artistic, political and scientific value for children.

B. A person shall be guilty of a Class 6 felony who:

1. Accosts, entices or solicits a person less than eighteen years of age with intent to induce or force such person to perform in or be a subject of sexually explicit visual material;

2. Produces or makes or attempts or prepares to produce or make sexually explicit visual material which utilizes or has as a subject a person less than eighteen years of age; or

3. Who knowingly takes part in or participates in the filming, photographing or other reproduction of sexually explicit visual material which utilizes or has as a subject a person less than eighteen years of age; or

4. Sells, distributes or gives away at wholesale or for resale sexually explicit visual material which utilizes or has as a subject a person less than eighteen years of age; or

5. Sells or distributes at retail or not for resale sexually explicit visual material which utilizes or has as a subject a person less than eighteen years of age.

C. A person shall be guilty of a Class 5 felony who knowingly finances or attempts or prepares to finance sexually explicit visual material which utilizes or has as a subject a person less than eighteen years of age.

D. For the purposes of this section a person who is depicted as or presents the appearance of being less than eighteen years of age in sexually explicit visual material is prima facie presumed to be less than eighteen years of age.

E. The provisions of this section shall be severable and, if any of its provisions shall be held unconstitutional by a court of competent jurisdiction, then the decision of such court shall not affect or impair any of the remaining provisions. (1979, c. 348.)

tion. But, reading the statute as a whole in light of the public concern which gave it birth, we believe the paramount legislative goal was to protect children from the harm they suffer when they are induced to become models for such materials, irrespective of the motive or intent of the offender.

We now consider whether the means employed by the statute are reasonably restricted to achieve its goal.

## I. CONSTITUTIONAL OVERBREADTH

■ Is the statute an overbroad encroachment upon the First Amendment, as Freeman contends? It proscribes distribution of material which is "obscene for children". Material which may be obscene for children is not necessarily obscene for adults, even though it is pornographic. Distribution of such pornography to children may constitutionally be forbidden by law. *Ginsberg* v. *New York,* 390 U.S. 629 (1968). Distribution to adults can be proscribed only if the pornography is obscene by adult standards. *Roth* v. *United States,* 354 U.S. 476 (1957). Adults cannot be limited to reading or seeing only those things fit for children. *Butler* v. *Michigan,* 352 U.S. 380 (1957); *Goldstein* v. *Commonwealth,* 200 Va. 25, 104 S.E.2d 66 (1958).

■ The distribution proscription in the Virginia statute extends to distribution to adults of child pornography which may not be obscene for adults, and Freeman thinks that its reach is fatally overbroad. We do not think so.

The destiny of the state rests with its minor citizens. Children are not always aware of the dangers to which they are exposed. Children may be led and misled. The state has a compelling interest, one central to its right to survive, in protecting its children from treatment it determines is physically or psychologically injurious to youth. The General Assembly has determined that the production and distribution of child pornography is such treatment. The statute it has enacted was intended to further the state's interest by punishing and deterring such treatment. As the data we have discussed shows, the legislature was justified in concluding that the process of production from which the harm flows cannot effectively be curtailed unless the profit motive is contained. Whatever restriction the distribution penalties impose upon the First Amendment rights of adults who want to sell or view child pornography is merely an effect incidental to the achievement of the goal the statute pursues.

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States* v. *O'Brien,* 391 U.S. 367, 377 (1968). As Justice Black said in *Younger* v. *Harris,* 401 U.S. 37, 51 (1971),

the existence of a "chilling effect," even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so.

 Freeman also contends that the statute is overbroad because, he says, it sweeps within its purview "artists and sculptors whose work requires no models at all more than imagination." The statute does not reach so far. The conduct it defines is penalized only when "a person less than eighteen years of age" has been used as a model in the production of child pornography. And, Freeman complains, "[t]here is no exception for parents or family." But he does not explain why a parent or relative has a First Amendment right superior to that of a stranger to use a juvenile member of the family as a model for the production of pornographic material.

## II. CONSTITUTIONAL VAGUENESS

Freeman's vagueness arguments, mingled indiscriminately with his overbreadth charges, do not invoke any constitutional guarantee discretely. As we understand those arguments, he contends that certain words and phrases offend the Due Process Clause because "they provide inadequate notice to the public of what conduct is prohibited."

As Freeman's brief illustrates, due process vagueness and First Amendment overbreadth are sometimes functionally interrelated. If statutory language defining an offense is vague, those charged with enforcement may interpret and apply the language too broadly. By way of example, Freeman points to the word "nudity" as used in the definition of "sexually explicit visual material."

"[N]udity alone is not enough to make material legally obscene." *Jenkins v. Georgia,* 418 U.S. 153, 161 (1974). But the word "nudity" in subsection A does not exist in a statutory vacuum. The depiction of nudity is proscribed only if it is "obscene for children". Moreover, Code § 18.2-390(2) defines nudity, in part, as "a state of undress so as to expose the human male or female genitals". "Patently offensive representations or descriptions of . . . lewd exhibition of the genitals" are among the "plain examples of what a state statute could define for regulation". *Miller v. California,* 413 U.S. 15, 25 (1973). Such materials are not constitutionally protected if they "depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." *Id.* at 27. As we construe our statutes, material depicting the lewd exhibition of a juvenile's genitals is "hard core" obscenity for children.

Freeman does not consider the pictures obscene, and he says that "there is no way for an adult citizen to predict" what material is "obscene for children". Hence, he finds that phrase constitutionally vague.

In a prosecution under Code § 18.2-374.1, the inquiry is whether the material in issue is obscene for children. If the evidence shows that it is, the offense is complete, and how the defendant may have regarded it is irrelevant. *See Rosen v. United States,* 161 U.S. 29, 41-42 (1896). The scienter requirement is satisfied if the defendant was aware of the nature of the material in issue, even if he did not know it was illegal.

It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials . . . and that he knew the character and nature of the materials. To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law. Such a formulation of the scienter

requirement is required neither by the language of [the statute] nor by the Constitution.

*Hamling* v. *United States,* 418 U.S. 87, 123-24 (1974).

█ We find no merit in Freeman's argument that the "obscene for children" phrase is vague in that it requires the producer to "consider the possible obscenity with regard to all children without regard to age, sex or other factors." It may be true that what is obscene for one child is not obscene for another. But obscenity may be defined with reference to a class more limited than the community at large. *Mishkin* v. *New York,* 383 U.S. 502 (1966) (deviant sexual class). And there is no constitutional requirement that all members of a defined class have the same levels of maturity or sensitivity or hold the same views. *Pinkus* v. *United States,* 436 U.S. 293 (1978). Indeed, it is the very diversity of viewpoint within the class which determines the average "contemporary community" standard.

█ In a related argument, Freeman suggests that the juvenile class is vague because it includes "not only juvenile models but any model who looks like a juvenile." He refers to subsection D of the statute which provides that "a person who is depicted as or presents the appearance of being less than eighteen years of age . . . is prima facie presumed to be less than eighteen years of age." We fail to see any due process implications in a rebuttable presumption which, by definition, does no more than shift the burden of going forward with the evidence.

█ One of the "guidelines" for determining what material is obscene for *adults* is "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law". *Miller* v. *California,* 413 U.S. at 24. Freeman believes that, while the Virginia statute includes the other *Miller* guidelines, it is unconstitutionally vague and overbroad because the "patently offensive" guideline "has no counterpart in § 18.2-374.1."

"[L]ack of precision [in defining obscenity] is not itself offensive to the requirements of due process." *Roth* v. *United States,* 354 U.S. at 491. We see no real difference between sexual material which "affronts contemporary standards", § 18.2-374.1(A)(2), and material which portrays sex "in a patently offensive way". More to the point, we find nothing in the Constitution or case law which requires a child pornography statute to

contain any particular counterpart of the judicial definition of adult obscenity. What is fit for adults is not necessarily fit for children. Child pornography which is not legally obscene for adults may be obscene for children. In the enactment of statutes to protect children exploited by adults in the production of pornography, legislatures are not constitutionally required to define obscenity by adult standards.

We reject Freeman's constitutional challenges, and we turn to the errors he assigns to certain evidentiary rulings.

## III. EVIDENTIARY RULINGS

### A. *Evidence of Prior Offenses*

A police officer testified that Freeman had confessed that he made the pictures in evidence and that, on other occasions, he had fondled J.M., kissed her genitals, allowed her to handle and kiss his genitals, and masturbated in her presence. Freeman objected to the testimony as inadmissible evidence of prior crimes. The trial court overruled his objection but cautioned the jury that the officer's testimony could be considered as evidence "showing motive or purpose which the defendant may have gone about making the pictures" but was "not to be taken by you as being evidence that he committed the offense for which he is now on trial."

On appeal, Freeman maintains that the evidence should have been excluded as prejudicial, inflammatory, and irrelevant. "The act of fondling and the act of photographing," he says, "are totally different and an individual with a propensity for one is not necessarily going to have a propensity for the other."

Generally, evidence of other offenses is inadmissible to prove the offense charged at bar. *Cumbee* v. *Commonwealth,* 219 Va. 1132, 1137-38, 254 S.E.2d 112, 116 (1979). But the general rule yields to certain well-defined exceptions.

> Evidence of other offenses is admissible if it shows the conduct and feeling of the defendant toward his alleged victim, if it establishes prior relations between the parties, or if it tends to prove any relevant element of the offense charged.

*Ryan* v. *Commonwealth,* 219 Va. 439, 447, 247 S.E.2d 698, 704 (1978). *See also, Moore* v. *Commonwealth,* 222 Va. 72, 278 S.E.2d 822 (1981); *Gibson* v. *Commonwealth,* 216 Va. 412, 219

S.E.2d 845 (1975); *Kirkpatrick v. Commonwealth*, 211 Va. 269, 176 S.E.2d 802 (1970).

The officer's testimony shows Freeman's conduct and feeling toward J.M. and their prior relationship. And it tends to prove relevant elements of the offense charged against him.

The Commonwealth was required by the statute to prove as one of the elements of the offense that the pictures Freeman produced appealed to prurient interest. Freeman's sexual encounters with J.M. evince lascivious motivation. The fact that he had a prurient interest in the pictures he made was relevant to the jury's determination whether the pictures appealed to prurient interests generally. Production of the pictures was not a crime if they contained "serious literary, artistic, political, or scientific value." *Miller,* 413 U.S. at 24; Code § 18.2-374.1(A)(3). Freeman's lascivious motivation in creating the sexually explicit material was also relevant to that element of the offense.

> [T]o aid a jury in the determination of whether the materials are obscene, the methods of their creation, promotion, or dissemination are relevant . . . . In essence, the Court has considered motivation relevant to the ultimate evaluation if the prosecution offers evidence of motivation.

*Pinkus,* 436 U.S. at 303. *See* Code § 18.2-384(8)(c).

The trial court carefully limited the jury's consideration of the officer's testimony to the question of motivation, and we are of opinion that the probative value of that testimony outweighed any potential prejudice.

### B. *Expert Testimony*

 Freeman questions admission of expert opinion testimony as proof the pictures were obscene for children.

As its expert witness, the Commonwealth called Dr. Merrill Runquist, a clinical psychologist, president of the Virginia Psychological Association, and a member of the University of Virginia faculty attached to the Division of Child and Family Psychiatry. As a practitioner, he sees adolescents and younger children for "diagnosis and psychotherapy". In the last two years, he had treated "a couple of hundred" children. "Sexual activity or sex interests are . . . behaviors [in] which psychology would have . . . interest," he explained, and "children . . . have sexual feel-

ings and interests". Dr. Runquist was acquainted with psychiatric literature, which he described as "voluminous", on the subject of children's sexual interests.

Over Freeman's objection, Dr. Runquist testified as follows:

Q. In your opinion, do those photographs appeal to the prurient interests of children as determined by the experience of children in the contemporary community?
A. It is my opinion and my experience with children in this community it would so appeal to their prurient interests.
Q. In your opinion . . . do these photographs lack literary, artistic, political and scientific value for children?
A. They have no such value as far as I would judge.

An expert witness may express an opinion within his field of expertise but not as to an ultimate issue of fact within the province of the jury. *Cartera* v. *Commonwealth,* 219 Va. 516, 248 S.E.2d 784 (1978). Freeman believes that Dr. Runquist's opinions violate that rule.

We disagree. The ultimate issue of fact before the jury was whether the pictures were "obscene for children". Whether the pictures appealed to prurient interest and whether the pictures had any socially redeeming value were only two of the three subparts of the statutory test of material "obscene for children". Hence, considered individually or collectively, the expert's opinions did not invade the jury's right to resolve the ultimate issue of fact.

Even so, Freeman argues that the question whether the pictures had any socially redeeming value was not a matter within Dr. Runquist's field of expertise. We must agree. " '[T]he question of the qualification of a witness to speak as an expert lies largely in the discretion of the trial court, whose judgment will not be reversed unless it clearly appears that the witness was not qualified.' " *Jordan* v. *Commonwealth,* 207 Va. 591, 598, 151 S.E.2d 390, 395 (1966). While the record reveals that Dr. Runquist was eminently qualified to express an opinion on the question whether the pictures appealed to the prurient interest of children, there was no evidence to show that he had any expertise in the fields of literature, art, politics, or science. Accordingly, the trial court erred in admitting his opinion that the pictures had no redeeming

social value for children. We next inquire whether the error was reversible or harmless.

Dr. Runquist was the only expert called at trial. But there is no "constitutional need for expert testimony . . . or for any other ancillary evidence of obscenity, once the allegedly obscene material itself is placed in evidence." *Kaplan* v. *California,* 413 U.S. 115, 121 (1973). *Accord, Paris Adult Theatre I* v. *Slaton,* 413 U.S. 49, 56 (1973) (materials "are the best evidence of what they represent"); *Ginzburg* v. *United States,* 383 U.S. 463, 465 (1966) (materials are "sufficient in themselves for the determination of the question").

> A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law.

*Hamling,* 418 U.S. at 104-05.

These Supreme Court pronouncements were made in cases in which pornographic material was allegedly obscene by adult standards. Here, the jury was required to determine whether Freeman's pictures were "obscene for children". We do not accept his thesis that an adult jury is unable to decide that question without benefit of expert advice. Many jurors are parents of children, most jurors are friends of children, and all jurors once were children themselves. We believe that jurors are qualified to judge a picture from a child's viewpoint and decide what effects it may have upon and whether it has any redeeming social value for the average member of the juvenile community.

We conclude that this jury, assessing the pictures they were shown and the evidence of lascivious motivation underlying their production, was fully justified in concluding that they were without socially redeeming value, and we hold that Dr. Runquist's opinion on that score was merely cumulative and that its admission was harmless error.

Finding no merit in Freeman's constitutional challenges and no reversible error in the evidentiary rulings he attacks, we will affirm the judgment.

*Affirmed.*